**MAINLINE CONTRACTING CORP., Plaintiff,**

v.

**CHOPRA–LEE, INC. and Camp Dresser & McKee, Inc., Defendants.**

**Chopra–Lee, Inc., Third–Party Plaintiff,**

v.

**Environmental Controls Corp., Third–Party Defendant.**

**No. 98–CV–361A.**

United States District Court, W.D. New York.

June 8, 2000.

Harter, Secrest & Emery (Craig A. Slater, of Counsel), Buffalo, NY, for Plaintiff.

Giardino & Schober (John J. Giardino, of Counsel), Buffalo, NY, for Defendant Chopra–Lee, Inc.

Hodgson, Russ, Andrews, Woods & Goodyear, L.L.P. (H. Kenneth Schroeder, Jr., and Hugh M. Russ, III, of Counsel), Buffalo, NY, for Defendant Camp Dresser & McKee, Inc.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. § 636(b)(1), on May 19, 1999. Motions for summary judgment were filed by defendant Camp Dresser & McKee, Inc. on August 24, 1999, and by defendant Chopra–Lee, Inc. on August 26, 1999. On March 22, 2000, Magistrate Judge Foschio filed a Report and Recommendation, recommending that the defendants' summary judgment motions be denied.

On March 31, 2000, defendant Camp Dresser & McKee, Inc. filed objections to the Report and Recommendation, and on April 13, 2000 plaintiff filed a response thereto. Oral argument on the objections was held on May 18, 2000.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendants' motions for summary judgment are denied and the case referred back to Magistrate Judge Foschio for settlement discussions. If the case is not settled, the parties shall appear before this Court on September 18, 2000 at 9:00 a.m. for a status conference.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This case was referred to the undersigned on May 19, 1999, by Honorable Richard J. Arcara for report and recommendation on all dispositive motions. The matter is presently before the court on motions for summary judgment filed by Defendants Camp Dresser & McKee, Inc., on August 24, 1999 (Docket Item No. 20), and Chopra–Lee, Inc. on August 26, 1999 (Docket Item No. 23).

### BACKGROUND

Plaintiff Mainline Contracting Corp. ("Mainline"), commenced this action on June 4, 1998, alleging causes of action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, and New York common law, incurred in connection with the disposal of transformer oil contaminated with polychlorinated biphenyls ("PCBs"). Specifically, the CERCLA causes of action include indemnification under 42 U.S.C. § 9607, contribution under 42 U.S.C. §§ 9607–13, and a declaration of rights under CERCLA. Complaint, Counts I, II and VIII. Mainline also seeks relief under New York common law grounds for negligence, strict liability, negligence *per se,* indemnification and common law contribution. Complaint,

Counts III, IV, V, VI and VII, respectively.

Defendant Chopra–Lee, Inc. ("Chopra–Lee"), filed an answer to the Complaint on July 7, 1998. On July 16, 1998, Chopra–Lee commenced a third-party action against Environmental Controls Corp. ("ECC"), from whom Chopra–Lee sought contribution should Mainline be ultimately found entitled to damages from Chopra–Lee. ECC's answer to the third-party complaint, filed September 4, 1998, asserts three counterclaims against Chopra–Lee, including to hold Chopra–Lee jointly and severally liable to ECC under 42 U.S.C. § 9607, contribution under 42 U.S.C. § 9607(a), and strict liability.

Camp Dresser & McKee, Inc. ("CDM"), filed an answer to the Complaint on September 28, 1998. Included in CDM's answer is a cross-claim against Chopra–Lee asserting that Chopra–Lee is required to indemnify CDM for any judgment entered against CDM, including attorney fees, costs and expenses, and to provide a defense for CDM.

On August 24, 1999, CDM filed the instant motion for summary judgment, accompanied by the Declaration of Hugh M. Russ, III, Esq. (Docket Item No. 20) ("Russ Declaration"), a Statement of Material Facts (Docket Item No. 21), and a Memorandum of Law (Docket Item No. 22) ("CDM Memorandum"). In opposition to CDM's motion, Mainline filed, on November 16, 1999, the Affidavit of Craig A. Slater, Esq. (Docket Item No. 37) ("Slater Affidavit I"), and a Memorandum of Law (Docket Item No. 38) ("Mainline Memorandum in Opposition to CDM's Motion"). In further support of its motion, CDM filed, on December 7, 1999, a Reply Memorandum of Law (Docket Item No. 40) ("CDM Reply"), and a Reply Declaration by Hugh M. Russ, III, Esq. (Docket Item No. 41) ("Russ Reply Declaration").

On August 26, 1999, Chopra–Lee also filed a motion for summary judgment, accompanied by the Affidavit of John J. Giardino, Esq. (Docket Item No. 23) ("Giardino Affidavit"), a Statement of Uncontested Facts (Docket Item No. 24), and a Memorandum of Law in support (Docket Item No. 25) ("Chopra–Lee Memorandum"). In opposition to Chopra–Lee's motion, Mainline filed, on October 5, 1999, an affidavit with exhibits by Craig A. Slater, Esq. (Docket Item No. 30) ("Slater Affidavit II"), an affidavit by Richard Ziegler (Docket Item No. 32) ("Ziegler Affidavit"), an affidavit by Norman N. Neuner (Docket Item No. 34) ("Neuner Affidavit"), a Memorandum of Law (Docket Item No. 31) (Mainline Memorandum in Opposition to Chopra–Lee's Motion), and a Response to Chopra–Lee's Statement of Uncontested Facts. (Docket Item No. 33).

Limited informal oral argument was conducted by telephone conference call on March 15, 2000. Following oral argument, the parties were permitted to file further submissions with the court. Accordingly, letters in further support of the summary judgment motions were submitted to the court by Chopra–Lee on March 17, 2000 (Docket Item No. 43), and by CDM on March 20, 2000 (Docket Item No. 44).

Based on the following, Camp Dresser & McKee, Inc.'s, and Chopra–Lee, Inc.'s motions should be DENIED.

### FACTS [1]

The claims in this action arise from the demolition and cleanup of the former Louisville Forge & Gear Works Inc. site ("the LF & G site" or "the site"), located in Louisville, Kentucky. Originally farmland, the LF & G site has been used for heavy industrial manufacturing since the 1940s including aircraft manufacturing, tractor manufacturing and forging engine parts. In 1993, the Louisville Regional Airport Authority ("the RAA"), acquired the LF & G site with intention of expanding the Standiford Airport ("the airport") located on land adjacent to the site.

---

1. The fact statement is taken from the pleadings and motion papers filed in this action.

In preparation for the airport expansion, on March 29, 1990, a Subcontract Agreement was executed between Howard, Needles, Tamme & Bergendoff ("HNTB"), as consultant to the RAA, and CDM, as subconsultant ("the 1990 Subcontract Agreement"). Services to be rendered by CDM to the RAA and HNTB under the 1990 Subcontract Agreement included assisting in final design activities for the expansion of the airport. These activities included environmental work which CDM, as subconsultant, was authorized to subcontract with other subconsultants to perform at the LF & G site. The 1990 Subcontract Agreement also provided that CDM was to indemnify the RAA and HNTB for any claims, losses, expenses or damages to property, unless such liability arose out of the RAA's negligence.

The RAA solicited bid proposals for the demolition and removal of all above-ground structures and improvements at the LF & G site. In connection with the bidding process, on October 25, 1996, the RAA issued the Contract Document for Demolition Services for LF & G—Phase II ("the Contract Document"), by which CDM was designated as the demolition Program Manager at the LF & G site, and vested with the authority necessary to ensure proper demolition, including stopping work on the project and rejecting any non-conforming work or material. The Contract Document defines the contractor as "[t]he individual, partnership, firm or corporation to which the Award [of the bid] is made and which is primarily liable for the acceptable performance of the Work in conformance with the Contract Documents." Contract Document, p. GC–3, Russ Declaration Exhibit N. The RAA awarded the contract for the demolition project to Mainline which became the contractor under the Contract Document. The Contract Document also contains an indemnification agreement that provides

> The Contractor [Mainline], and all Subcontractors, agree to indemnify and hold the Authority [the RAA], Camp, Dresser

> & McKee, the Program Manager and their respective officers, agents and employees, free and harmless from and against any and all claims, suits, loss or damage, or injury to persons or property that might occur during the construction of the Project, *unless such acts result from the sole negligence of the Authority, Camp, Dresser & McKee, the Program Manager and their respective officers, agents or employees.*

Contract Document, p. SC–1, ¶ 1 and p. SCC–1 (Addendum Number 1), Exhibit N to Russ Declaration, and Exhibit C to Slater Affidavits I and II (emphasis added).

On December 18, 1996, CDM submitted a proposal to HNTB to provide services related to the LF & G site demolition project. On January 9, 1997, Mainline and the RAA executed the actual contract for the demolition work to be performed at the site ("the Demolition Contract"). Exhibit C to Russ Reply Declaration. The Demolition Contract incorporated by reference the Contract Document. Contract Document, p. C–1, Exhibit C to Russ Reply Declaration.

On January 24, 1997, HNTB and CDM executed Amendment No. 3 to the 1990 Subcontract Agreement ("Amendment No. 3"), which provided for CDM to perform certain professional services in connection with the LF & G demolition project. Slater Affidavits I and II, Exhibit D. Such services included an agreement that CDM would continue its work on environmental matters involving the site. *Id.* Among its duties, CDM was required to attend the pre-bid conference for the LF & G site demolition contractor procurement to answer bidding contractors' questions regarding potential chemical hazards associated with the site. *Id.* CDM was also expected to review shop drawings, samples, test and inspection results, and other data the RAA requested the contractor submit. *Id.* Amendment No. 3 obligated CDM to perform on-site observations and field checks to further protect the RAA from defects and deficiencies in the demo-

lition work. *Id.* In furtherance of Amendment No. 3, on January 14, 1997, the RAA Project Manager, Rich Reidl, authorized CDM's inspectors, to sign as the "Owner Representative" for waste disposal manifests required in connection with the removal of waste material from the site. Slater Affidavit I, Exhibit E; Slater Affidavit II, Exhibit F.

As permitted under the 1990 Subcontract Agreement, CDM, on February 7, 1997, entered into a Subcontract Agreement with Chopra–Lee ("Chopra–Lee Subcontract Agreement"), pursuant to which Chopra–Lee assigned Mr. Peter Cherenzia as its resident project representative for the LF & G site demolition project. Included in the Chopra–Lee Subcontract Agreement was an indemnification clause by which Chopra–Lee was to indemnify CDM for any cause of action arising out of error, omission or negligence of Chopra–Lee in connection with the LF & G project. Russ Declaration, Exhibit E, p. 5.

In January 1997, Mainline subcontracted with ECC to remove asbestos-containing building materials from structures on the LF & G site. Six electrical transformers, discovered at the site in early 1997, were also brought to Mr. Cherenzia's attention by a Mainline employee. Cherenzia advised Mainline employee Norman N. Neuner ("Neuner"), that samples of the transformer oils would be required. The Mainline subcontract with ECC was then specifically modified to provide for ECC's removal of the transformers, including the waste oil contained therein.

On February 26, 1997, Project Manager Reidl asked Cherenzia to assist Neuner in collecting the oil samples from the transformers. On February 27, 1997, Cherenzia and Neuner collected oil samples from all six transformers. There were four ports on each of the transformers from which samples could be taken, although Cherenzia and Neuner were concerned that if, upon wrenching, the drain valves at the bottom of the transformers snapped, a major spill would result. Therefore, the oil samples were collected from valves located on the sides of the transformers.

Mainline then forwarded the samples to Louisville Testing Laboratories ("LTL") for analysis. The Chain of Custody form that accompanied the samples to LTL was largely completed by Cherenzia. The LTL test results indicated the samples contained no detectable levels of PCBs and Cherenzia and Richard E. Zeigler of ECC decided to have the waste oil pumped out of the transformers for disposal.

On April 11, 1997, 1500 gallons of waste oil were drained out of the transformers into trucks owned by Kyana Oil ("Kyana"). Cherenzia executed a non-hazardous waste manifest form which authorized the oil to be hauled from the site. Slater Affidavits I and II, Exhibit L. An additional 1400 gallons of waste oil was drained from the transformers into Kyana trucks on April 16, 1997, for which Cherenzia executed another non-hazardous waste manifest form. Slater Affidavits I and II, Exhibit M. Kyana then transferred the waste oil from its trucks into a holding tank on property it owned in Louisville. Slater Affidavits I and II, ¶ 55; Russ Declaration, ¶ 25.

Kyana later reloaded the waste oil from its holding tank into its trucks and transported it to Payne Trucking ("Payne") in Louisville. Upon accepting the waste oil, which was transferred into Payne's trucks, Payne transported a truckload of the oil to Warrior Oil, Inc. ("Warrior"), located in Franklin, Indiana, for recycling. Upon arriving at Warrior's facilities, Warrior collected a sample of the waste oil for analysis. However, pumping of the waste oil from Payne's truck into Warrior's tanks began before the laboratory results from Warrior's sample were known. Warrior's laboratory results indicated that the waste oil contained PCBs in excess of acceptable regulatory standards. The pumping of the waste oil into Warrior's tanks was immediately stopped. The Kyana, Payne, Warri-

or and LF & G sites were thus contaminated with PCBs from the site.

The same six electrical transformers sampled on February 27, 1997, were re-sampled on May 20, 1997. Five of the six samples, analyzed this time by Specialized Assays, Inc., tested positive for PCBs. The first six samples, obtained by Cherenzia and Neuner in February 1997, allegedly yielded false negative results for PCBs either because the ports from which the samples were taken did not have accumulations of circulated PCBs, or because the samples were taken from the sides of the transformers, rather than from the drain valve at the bottom where the PCBs settle in waste oil. As a result, Mainline spent in excess of $600,000 cleaning the Kyana, Payne, Warrior and LF & G sites.

### DISCUSSION

#### 1. *Summary Judgment*

Summary judgment of a claim or defense will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra*, at 331, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judg-

ment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra*, at 247–48, 106 S.Ct. 2505.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, at 323–24, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga, supra*, at 18 (citing cases).

## A. *Arranger Status*

■ Congress enacted CERCLA as "a broad remedial statute designed to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten the environment and human health." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197 (2d Cir.1992). CERCLA ensures " 'that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.' " *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285 (2d Cir.1992) (quoting S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), U.S.Code Cong. & Admin,News 1980, 6119, reprinted in 1 CERCLA Legislative History at 320). As a remedial statute, CERCLA is to be liberally construed to give effect to its purposes. *Schiavone v. Pearce*, 79 F.3d 248, 253 (2d Cir.1996).

"CERCLA addresses in particular the costs of responding to the release or threatened release of 'hazardous substances,' as that term is defined by CERC-LA § 101(14)(42 U.S.C. § 9601(14))." *Prisco v. A. & D. Carting Corp.*, 168 F.3d 593, 603 (2d Cir.1999). Toward that end, CERCLA provides that a private right of action may be brought to recover such costs from anyone who falls within one of four specific categories of potentially responsible parties set forth under § 107. *Prisco, supra,* at 602 (citing 42 U.S.C. § 9607).

■ To establish a *prima facie* cause of action under CERCLA, the plaintiff must demonstrate: (1) the defendant is a responsible party as defined under § 9607(a); (2) the site is a facility as defined in § 9601(9); (3) the release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred response costs in connection with the release; and (5) the cost incurred and response actions taken conform to the National Contingency Plan ("NCP") established under the CERCLA and administered by the EPA. *AAMCO, supra,* at 285; *Murtha, supra,* at 1197. Upon establish-ing these four elements, the defendant is then strictly liable for the release or threatened release of hazardous substances unless it successfully invokes one of the statutory defenses set forth under 42 U.S.C. § 9607(b). *Prisco, supra,* at 603.

Here, the parties do not dispute that Mainline incurred response costs, that the LF & G site is a facility, or that costs incurred were in conformity to the NCP. Rather, at issue is whether Defendants qualify as responsible parties as defined under 42 U.S.C. § 9607(a). CERCLA establishes four classes of parties who may be held responsible for costs incurred in responding to releases or threatened releases of hazardous substances: (i) generators of hazardous substances, (ii) present or past owners or operators of facilities, (iii) transporters of hazardous substances, and (iv) those who arrange for the disposal or treatment of hazardous substances. *AAMCO, supra,* at 285 (citing 42 U.S.C. § 9607(a)); *Murtha, supra,* at 1198 (same). The issue raised by the motions before the court is whether CDM and Chopra–Lee may be liable as parties which arranged for the transportation of a hazardous substance.

■ Whether arranger liability may be imposed on a party is generally a fact dependent question. *See United States v. Vertac Chemical Corp.*, 966 F.Supp. 1491, 1500 (E.D.Ark.1997) (discussing correctness of jury instructions in action where jury decided issue whether defendant subject to CERCLA liability as arranger); *Chem–Nuclear Systems, Inc. v. Arivec Chemicals, Inc.*, 978 F.Supp. 1105, 1111 (N.D.Ga.1997) (denying summary judgment under CERCLA where reasonable jury could find defendant arranged for disposal of hazardous waste); *Saco Steel Co. v. Saco Defense, Inc.*, 910 F.Supp. 803, 810 (D.Me.1995) (same). In this case, whether either CDM or Chopra–Lee can be held liable as an arranger under CERCLA

presents an issue of fact which must be resolved by the fact-finder at trial.

Under 42 U.S.C. § 9607(a)(3)

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances [is a responsible party liable for necessary response costs].

42 U.S.C. § 9607(a)(3).

■ Accordingly, there are three elements that must be met before a defendant can be liable under CERCLA as an arranger. First, the defendant must be a "person" as defined under CERCLA; second, the defendant must "own" or "possess" the hazardous substance at issue; and third, the defendant must, by contract, agreement or otherwise, arrange for the transport or disposal of such hazardous substances. *See CP Systems, Inc. v. Recovery Corp. of Illinois*, 1994 WL 174162, *3 (N.D.Ill.1994) (citing *C. Greene Equipment Corp. v. Electron Corp.*, 697 F.Supp. 983, 986 (N.D.Ill. 1988), and *United States v. Ward*, 618 F.Supp. 884, 893–94 (E.D.N.C.1985)). The term "person" is broadly defined under CERCLA to include a corporation, 42 U.S.C. § 9601(21), thereby encompassing Defendants which are both corporations. Defendants do not dispute that they are "persons" within the meaning of CERCLA. Whether Defendants satisfy the remaining two elements, *i.e.*, ownership or possession of hazardous waste and arranging for its transport and disposal, is, however, contested.

With regard to the second element, CDM maintains that it neither owned nor possessed the RAA's transformers at the site in which the PCB-contaminated waste oil was found.[2] CDM's Memorandum at 10–11. In furtherance of CERCLA's stated remedial purpose, courts have broadly construed the term "ownership" to mean more than mere physical possession. In *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir.1986), the court stated that "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme" in determining whether an alleged arranger owned or possessed the subject hazardous substance, as "requiring proof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA." *Northeastern Pharmaceutical, supra*, at 743–44 (citing *United States v. Mottolo*, 629 F.Supp. 56, 60 (D.N.H.1984) (holding person who arranges for disposal or transportation for disposal need not own or possess the hazardous waste)), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *see also United States v. Bliss*, 667 F.Supp. 1298, 1306–1307 (W.D.Mo.1987) (holding that "arranger" liability may attach without actual ownership provided the defendant had authority and control over the place and manner of disposal). *See also Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 302 (2d Cir.1996) (discussing liability for injuries arising from property based on duty as dependent on "occupancy, ownership, control or special use of property" and citing RESTATEMENT (SECOND) OF TORTS § 328E (1964) (defining "possessor of land" generally as a person in occupation with intent to control land) and § 343 (possessors subject to liability for certain conditions on land)). Accordingly, that CDM was not, in the traditional sense, the "owner" of the transformers and their contents, is irrelevant to whether CDM may be found to have owned or

---

2. Chopra–Lee does not argue that it did not own or possess the waste oil, relying instead solely on the contention that it did not arrange for the disposal of the hazardous substance.

possessed them for the purpose of casting CDM in liability as an arranger under CERCLA § 107(a)(3).

Further, in this case, there are ample facts in the record on which the trier of fact could determine that either CDM or Chopra–Lee, or both, had control over the disposal of the waste oil. Specifically, Mainline points to evidence establishing that with regard to the demolition project at the LF & G site, CDM, as Program Manager, was contractually obligated to review and manage all environmental issues, assure environmental compliance, assure that all hazardous substances at the site were properly handled, advise of potential chemical hazards associated, review and monitor daily and weekly job logs, review and approve all sampling test results, review all paperwork for wastes shipped from the site and review, and approve all sampling test results. Slater Affidavit I, ¶ 5. Mainline further maintains that CDM was authorized to establish how environmental media (*e.g.*, soil and water), were to be tested, issue cease work orders if applicable regulations were violated during project completion, and to authorize off-site shipment of waste and execute waste manifests related to waste transportation and disposal. *Id.*

CDM does not dispute these assertions and, significantly, the Contract Document indicates that CDM, as the project Engineer, is responsible for such duties and vested with such authority. Russ Declaration, Exhibit N; Slate Affidavit I, Exhibit C.[3] Rather, CDM asserts that Mainline has failed to point to any evidence establishing that CDM was contractually obligated to exercise control over the disposal of hazardous waste. Russ Reply Declaration, ¶¶ 4–7.

Additionally, Mainline contends that, as CDM's subcontractor, Chopra–Lee was obligated to oversee all activities at the LF & G site, assure full compliance with all applicable laws and regulations, assure all materials were properly handled, review all paperwork for all waste materials transported and deposited off-site, and verify that information in any waste manifest was correct. Slater Affidavit II, ¶ 34. Mainline further points to evidence that Chopra–Lee was authorized to execute waste manifests on behalf of the RAA, thereby permitting waste materials to be transported off-site, and issue cease-work orders in the event of a deficiency during project completion. *Id.* Chopra–Lee employee Cherenzia's deposition testimony supports these assertions, *see* Exhibit G to Slater Affidavits I and II, and neither CDM nor Chopra–Lee argues otherwise.

Moreover, the record shows that both CDM and Chopra–Lee were selected to work on the LF & G site demolition project based on their expertise in working with matters involving environmental risks. 1990 Subcontract Agreement (referring to CDM's scope of services with regard to the demolition project as a "series of Environmental Work Orders"), Exhibit B to Slater Affidavits I and II; Cherenzia Deposition Transcript at 28–29, 54–55 Exhibit G to Slater Affidavits I and II. On this record, a trier of fact could find that CDM and Chopra–Lee had sufficient control over the LF & G site such that they possessed control over the disposal of the waste oil found in the transformers located on the site. The court thus properly examines whether CDM and Chopra–Lee could also be found to be arrangers under 42 U.S.C. § 9607(a)(3).

■ The fact that a party merely had the opportunity or ability to control another party's waste disposal practices is insufficient to hold that party liable as an arranger under CERCLA. *AAMCO, supra*, at 286. However, a party that was not actively involved in "the timing, man-

**3.** Although Mainline and CDM both refer to CDM as the Program Manager with regard to the demolition project at the LF & G site, there are indications in the record that CDM was also referred to as the Project Engineer, including the Chopra–Lee Subcontract Agreement dated February 7, 1997. Russ Declaration Exhibit E.

**120**

ner or location of disposal" may be held liable as an arranger. *Id,* (quoting *CPC International, Inc. v. Aerojet–General Corp.,* 759 F.Supp. 1269, 1279 (W.D.Mich. 1991)) (internal quotation marks omitted). Specifically, for arranger liability to attach, "there must be some nexus between the potentially responsible party and the disposal of the hazardous substance." *Id,* (citing *CPC International, supra,* at 1278, and *Murtha, supra,* at 1199). Such nexus is premised upon the potentially responsible party's conduct, sufficient to impose an obligation, with respect to the disposal or transport of the hazardous substance. *AAMCO, supra,* at 286. As the Second Circuit stated, "it is the *obligation* to exercise control over hazardous waste disposal," rather than the mere ability or opportunity to control such disposal, that renders a party subject to arranger liability under CERCLA. *Id.* (emphasis in original).

In this case, the contract documents pursuant to which CDM provided the RAA with environmental services in connection with the demolition project at the LF & G site, obligated CDM to supervise the demolition project and assure compliance with all applicable environmental regulations. 1990 Subcontract Agreement, Exhibit B to Slater Affidavits I and II; Amendment No. 3, Exhibit E to Russ Declaration. Under the Chopra–Lee Subcontract Agreement executed by CDM and Chopra–Lee on February 7, 1997, CDM subcontracted with Chopra–Lee to perform certain services with respect to the demolition project at the LF & G site that CDM was obligated to perform under Amendment No. 3. Russ Declaration, Exhibit E. It was pursuant to the Chopra–Lee Subcontract that Mr. Cherenzia was appointed as the resident project representative, thereby assuming supervisory responsibilities with regard to the demolition project, including compliance with applicable environmental regulations. These facts could be construed by a reasonable trier of fact as establishing that CDM or Chopra–Lee had an obligation, rather than a mere opportunity, to control the disposal of any hazardous substances on the site.

Additionally, in this case, before the waste oil could be shipped off the LF & G site, the generator of such waste was required to execute a "non-hazardous waste manifest," certifying that the contents of the shipment were accurately described, were in proper condition for transport, and were not subject to federal hazardous waste regulations. KY. REV. STAT. ANN. § 224.43–335 (Banks–Baldwin 1998) (requiring manifest be completed before non-hazardous waste may be accepted by transporter or waste disposal facility, certifying such waste was non-hazardous); *see* Slater Affidavit I, Exhibit E, and Slater Affidavit II, Exhibit F; Cherenzia Deposition Transcript, Exhibit G to Slater Affidavits I and II, pp. 29, 40–43, 54–55, 116–20. The manifests executed with regard to the waste oil at issue were signed by Chopra–Lee employee Mr. Cherenzia. Exhibits L and M to Slater Affidavits I and II.[4] Moreover, according to the letter from the RAA Project Manager, Rich Riedl, authorizing CDM's inspectors to sign waste manifests as the "Owner Representative," Chopra–Lee employee Cherenzia was considered a CDM inspector. Slater Affidavit I, Exhibit E; Slater Affidavit II, Exhibit F. Thus, as the Subcontract Agreement, which incorporated by reference Amendment No. 3, required CDM to assure the demolition work conformed to environmental laws and as Chopra–Lee was CDM's agent in executing the manifest as a legally required action to permit removal of the hazardous waste oil from the site, such evidence raises a material issue of fact as to whether CDM and Chopra–Lee acting on its behalf as its subcontractor had an obligation to control the waste sufficient to render them both liable as arrangers for purposes of § 107.

4. CDM conceded during oral argument that at all times relevant to the instant case, Cho-pra–Lee acted as CDM's agent pursuant to the Chopra–Lee Subcontract Agreement.

However, it was later discovered that the waste oil contained PCBs. PCBs are listed among the 700 substances which the EPA has designated as hazardous for purposes of CERCLA. Table 302.4, 40 C.F.R. § 302. The oil that was drained out of the transformers thus was not non-hazardous but, rather, hazardous waste and, as such, subject to different regulations. Specifically, pursuant to 40 C.F.R. § 262.20

> A generator who transports or offers for transportation, hazardous waste for off-site treatment, storage, or disposal must prepare a Manifest OMB control number 2050-0039 on EPA form 8700-22, and, if necessary, EPA form 8700-22A
> . . . .

40 C.F.R. § 262.20.[5]

Regardless of whether the waste oil qualified as hazardous or non-hazardous waste, it could not be transported off the LF & G site prior to execution of the applicable waste manifest. 40 C.F.R. § 262.20 (hazardous waste); KY. REV. STAT. ANN. § 224.43–335 (Banks–Baldwin 1998) (non-hazardous waste). Further, Mr. Cherenzia also allegedly completed the chain of custody form that accompanied the waste oil shipment. Under these circumstances, a trier of fact could find that Mr. Cherenzia's signature on the manifest demonstrates the requisite nexus between Chopra–Lee and the disposal of the waste oil to subject Chopra–Lee to arranger liability under CERCLA § 107(a)(3). *See Emergency Tech. Servs. Corp. v. Morton Int'l,* 1993 WL 210531, *2–3 (N.D.Ill.1993) (finding defendant corporation liable as an "arranger" where, *inter alia,* defendant provided shipping and manifest documents and labels for waste drums and supplied description codes and instructions for completing waste manifests).

■■■ Although Chopra–Lee employee Cherenzia was specifically granted signatory authority with regard to the waste manifests, the record indicates that such authority was granted to Cherenzia as CDM's inspector. Slater Affidavit I, Exhibit E; Slater Affidavit II, Exhibit F. "[T]he established rule is that a principal is liable to third parties for the acts of an agent acting within the scope of his real or apparent authority." *Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 623–24 (2d Cir.1989). Further, CERCLA liability may attach to an agent acting within the scope of his agency responsibilities to the principal. *See* 42 U.S.C. § 9607(b) (exempting from specifically enumerated CERCLA defenses liability based on "an act or omission of a third party *other than*

---

5. CDM argues that as 40 C.F.R. § 262.20 applies only to "generators of hazardous waste," it does not apply to CDM which is not such a generator. Letter of Hugh M. Russ, III, filed March 21, 2000 (Docket Item No. 44) at 2. The court notes, however, that under the regulations pertaining to the Solid Waste Disposal Act, 42 U.S.C. §§ 9601, *et seq.,* the term "generator" includes not only any person who produces hazardous wastes, but also one "whose act first causes a hazardous waste to become subject to regulation." 40 C.F.R. § 260.10. Upon removal of hazardous waste from a facility, such wastes are "subject to regulation." *Al Tech Specialty Steel Corp. v. Environmental Protection Agency,* 846 F.2d 158, 159–60 (2d Cir.1988) (holding leachate was hazardous waste subject to regulation where it exhibited characteristic of hazardous waste). Thus, if the evidence demonstrates that the PCB contaminated oil first became subject to regulation, *i.e.,* upon removal from the transformers and the LF & G site, based on an act attributable to CDM, CDM would then be a generator for purposes of the Solid Waste Disposal Act. Further, although some courts have held that "generator," as used under CERCLA, refers to an "arranger," *see e.g., United States v. USX Corp.,* 68 F.3d 811, 815 (3d Cir.1995), this court's research indicates the term "generator" has not been defined under CERCLA. That a "generator" is not expressly defined under CERCLA raises a question whether CDM would, if found to be a generator under the Solid Waste Disposal Act, also be a generator for purposes of CERCLA liability. In any event, even if CDM and Chopra–Lee had no contractual "obligation to control" the removal of the waste oil, arranger liability may be established based on an "obligation to control" the waste oil pursuant to the applicable legal requirement of the Solid Waste Disposal Act.

an employee or *agent* of the defendant .…") (emphasis added). *See also Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1503–1505 (11th Cir. 1996) (holding management agent for apartment complex whose obligations were similar to those of owner subject to CERCLA liability as owner). Accordingly, on this record, if the trier of fact finds that Chopra–Lee is subject to arranger liability based on Cherenzia's signature on the waste manifests which ultimately permitted the waste to be transported off the site, then such liability may be imputed to CDM as Chopra–Lee's principal under applicable agency principles. Moreover, it is undisputed Chopra–Lee was CDM's subcontractor for purposes of assuring that the demolition project was conducted in accordance with applicable environmental laws. Chopra–Lee Subcontract Agreement, Russ Declaration Exhibit E, pp. 1–3. Thus, a reasonable jury could find, based on the CDM contract to provide environmental oversite and assurance that the demolition project complied with applicable law, that CDM and Chopra–Lee had an obligation to control the removal of the hazardous wastes and that they in fact exercised such control. The fact that the waste oil was, as the time of its removal, unknown to be hazardous, is irrelevant as CERCLA imposes strict liability upon responsible parties. *Prisco, supra,* at 603.

Defendants cite *AAMCO, supra,* in support of their argument that because they, like the defendant oil companies in *AAMCO, supra,* did not actually participate in the selection of the disposal site, manner or timing of the disposal, they may not be held liable in the instant case as arrangers. However, in *AAMCO,* the defendant oil companies' only relationship to the defendant service station operators was founded on lease arrangements whereby the oil companies leased service station premises and equipment to the independent service station operators. *AAMCO, supra,* at 283. The court held that the mere existence of economic bargaining power which the defendant oil companies could have invoked to impose certain terms and conditions, such as how waste oil was to be disposed, on the independent service station operators was insufficient to subject the oil companies to arranger liability. *Id.,* at 286–87. In contrast, in the instant case, the same alleged facts on which the trier of fact could find CDM or Chopra–Lee sufficiently controlled the waste oil pursuant to a contractual obligation such that either CDM or Chopra–Lee owned or possessed it may be found by the trier of fact to establish the necessary nexus between the waste oil and its disposal in order for arranger liability to attach. *See AAMCO, supra,* at 286–87. On this record, CDM and Chopra–Lee may be found to have been actively involved in the course of conduct leading to the removal of the hazardous wastes from the site, not simply providing technical assistance and advice. Thus, there exists a genuine issue of material fact upon which either CDM or Chopra–Lee, or both, may be considered as arrangers for purposes of liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

Accordingly, Defendants' motions, on this ground, should be DENIED.

## B. *Indemnification Agreement*

As stated, the Contract Document executed between the RAA and Mainline provides for Mainline to indemnify the RAA and CDM for any claim, suit or other loss or damage occurring during the demolition project. Contract Document, p. SC–1, ¶ 1 and p. SCC–1 (Addendum Number 1), Exhibit N to Russ Declaration, and Exhibit C to Slater Affidavits I and II. Accordingly, CDM also requests Mainline be ordered to defend and indemnify CDM in all respects relative to this action. CDM Answer (Docket Item No. 12), ¶¶ 11 and 12; CDM Memorandum at 12–13,16.

Mainline asserts, however, that as its claims against Defendants arise out of the LF & G demolition project, such claims are not within the four corners of the

indemnification clause which pertains only to claims that "occur during *construction* of the Project." Mainline Memorandum in Opposition to CDM's Motion, at 20 (emphasis added). According to Mainline, as the term "construction" is not defined in the contract, it "must be given its plain meaning which would not include, under any strained permutation, destruction, deconstruction, or demolition," nor the disposal of PCB-contaminated waste. Mainline Memorandum in Opposition to CDM's Motion at 21. The court finds Mainline's creative argument without merit.

 A construction of the contract under Kentucky law, as Mainline asserts is required, does not support Mainline's argument.[6] Under Kentucky law, as is the general rule, written contracts are to be interpreted to give meaning to all words and clauses contained therein. *Roberts v. Huddleston,* 259 Ky. 595, 82 S.W.2d 469, 472 (1935). Here, the failure to construe the term "construction" as including *destruction, deconstruction and demolition* would render the indemnification agreement contained in the contract a nullity as the primary object of the work to be performed under the contract between the RAA and Mainline was demolition of the structures at the LF & G site. Rather, the term "construction" is used in the indemnification clause as used in the contract should reasonably be construed to include destruction, deconstruction and demolition, the very work to be performed at the site. This finding is consistent with a plain reading of the Contract Document in its entirety which, as its title indicates, is a "Contract Document for Demolition Services." Contract Document, Exhibit N to Russ Declaration, and Exhibit C to Slater Affidavits I and II. The contract also refers repeatedly to the "construction" to be performed thereunder. *See, e.g.,* Contract Document, pp. GC–40—GC–42 (referring to "Construction Progress Schedule").

The "Construction Project Schedule" is defined as "[a] detailed plan showing the sequencing and timing of the Work, and for the Project ...." Contract Document, p. GC–6. "Project" is defined as "[t]he agreed scope of Work for completion of the 'Demolition Services Lousiville Forge & Gear–Phase II, LAIP Contract No. 132, Louisville International Airport,' as described in these Contact Documents." *Id.* Further, "Work" is defined as "[a]ll labor, Materials, Supplies, tools, Equipment, and incidentals necessary or convenient to the Contractor's performance of all duties and obligations imposed by the Contract Documents, including, without limitation, all of the Contractor's warranty obligations, express or implied." *Id.,* p. GC–7. Thus, while perhaps somewhat awkward, the word "construction" fairly encompasses all of the work to be performed under the contract between the RAA, CDM and Mainline, including the demolition and removal of wastes.

Mainline also argues, in opposition, that CDM is not an intended beneficiary of the Contract Document, which was executed between only the RAA and Mainline but, rather, an incidental beneficiary which, under Kentucky law, cannot enforce the indemnification agreement against Mainline. Mainline Memorandum in Opposition to CDM's Motion at 19. Mainline thus urges the court to find that Mainline had no obligation or duty to indemnify CDM under the Contract Document. *Id.* On the other hand, according to CDM, as the indemnification agreement expressly provides for Mainline to indemnify CDM with regard to the underlying claims, should the court fail to apply the indemnification clause, Mainline would recover from CDM for the very loss that the indemnification clause in the Contract Document was intended to cover, thereby circumventing Mainline's own express obligations under

6. The parties do not dispute the applicability of Kentucky law to the indemnity issues in this case.

the contract. CDM Memorandum at 12–13.[7]

Mainline's argument fails to consider Addendum Number 1's effect on the Contract Document. Specifically, Addendum Number 1, dated November 12, 1996, provides for the incorporation of the words "Camp, Dresser & McKee, the Program Manager" into the indemnification agreement such that Mainline agreed to indemnify not only the RAA, but also CDM. Addendum Number 1, p. SCC–1, Exhibit N to Russ Declaration. Addendum Number 1 was made part of the Contract Document, see Contract, Exhibit C to Russ Reply Declaration, and Mainline does not argue otherwise. Accordingly, CDM is not merely an incidental beneficiary to the Contract Document but, rather, an intended beneficiary of the subject indemnification clause.

■ CDM's primary argument in support of summary judgment under the indemnification provision is that unless the court finds that the indemnification agreement precludes the instant action, Mainline potentially could recover for the very loss for which it has agreed to indemnify CDM, thereby rendering the indemnification clause a nullity, contrary to the intent of the parties to the agreement. CDM Memorandum at 12–13. CDM's theory ignores the fact that the relevant indemnification clause specifically exempts from the stated indemnification actions which "result from the sole negligence of the Authority [the RAA], Camp, Dresser & McKee, the Program Manager and their respective officers, agents or employees." Contract Document, p. SC–1 and p. SCC–1 (Addendum Number 1), Exhibit N to Russ

Declaration, and Exhibit C to Slater Affidavits I and II.

As discussed, a critical fact at issue in this case is whether the conduct by Chopra–Lee's employee Mr. Cherenzia was negligent in directing that the oil samples be collected from ports located on the sides of the transformers, rather than from the bottom drain valves, where PCBs were, it is asserted, more likely to have accumulated. CDM disputes that Cherenzia was involved in deciding from which of the four ports the samples should be collected. Mainline, in opposition to CDM and Chopra–Lee's motion, submitted an affidavit prepared by Mr. Neuner, the ECC employee who accompanied Cherenzia in collecting the samples, in which Neuner states that it was Cherenzia who decided from which ports to collect the oil samples and who opened the valves to permit Neuner to collect the samples. Neuner Affidavit, ¶ 11. Mainline also submits excerpts from Cherenzia's deposition in which Mr. Cherenzia denies he made the decision to take the oil samples from the side ports, but admits wrenching open the ports to enable the sample to be collected. Cherenzia Deposition at 104–107, Exhibit G to Slater Affidavits I and II. On this record, the court finds a genuine issue of material fact exists with regard to whether Cherenzia's conduct in collecting the oil samples, under all the circumstances, was negligent. If Cherenzia were negligent, and such negligence were found to be the sole cause of the response costs at issue, then as a Chopra–Lee employee and agent of CDM, such conduct could also be found by the fact trier to be outside the indemnification clause.[8] If such were the

7. As filed, CDM's summary judgment motion also seeks summary judgment that Chopra–Lee was required to indemnify CDM with regard to the instant action. CDM Memorandum at 13–14. That part of the motion was, however, withdrawn by CDM. Letter of Hugh M. Ross, III, Esq., dated October 14, 1999 (Docket Item No. 42).

8. Mainline also claims that the removal of the transformer oil was not performed under the

Contract Document. Mainline Memorandum in Opposition to CDM's Motion at 21–22. However, as discussed, supra, in connection with whether Defendants are arrangers under 42 U.S.C. § 9607(a)(3), all phases of the demolition project were performed by the parties pursuant to the Contract Document, pursuant to which CDM was named the Program Manager with supervisory authority over the entire project.

result at trial, recovery by Mainline would not defeat the purpose of the indemnification clause on which CDM and Chopra–Lee rely; rather, it would be consistent with its express terms.

Accordingly, summary judgment in favor of CDM and Chopra–Lee upon the indemnification clause should be DENIED.

### CONCLUSION

Based on the foregoing, the motions filed by Defendants Camp Dresser & McKee, Inc. (Docket Item No. 20), and by Chopra–Lee, Inc. (Docket Item No. 23), should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.

March 22, 2000.