**The State of NEW YORK, Plaintiff,**

v.

**SOLVENT CHEMICAL COMPANY, INC., ICC Industries, Inc., Defendants.**

**No. 83–CV–1401C.**

United States District Court, W.D. New York.

Aug. 14, 2002.

Jaeckle, Fleischmann & Mugel, LLP, (Dennis P. Harkawik, and Brenda J. Joyce, of counsel), Buffalo, NY, for Solvent Chemical Company, Inc.

Phillips, Lytle, Hitchcock, Blaine & Huber, LLP, (Robert E. Glanville, of counsel), Buffalo, NY, Choate Hall & Stewart, (H. Hamilton Hackney, III, and Kristen W. Sherman, of counsel), Boston, MA, for third-party defendants Benjamin Sack and Bay State Smelting Co., Inc.

## INTRODUCTION

CURTIN, District Judge.

Presently before the court are four motions related to a third-party action brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* Third-party defendants Bay State Smelting Company, Inc. ("Bay State") and Benjamin Sack ("Sack") have filed a motion for summary judgment against third-party plaintiff Solvent Chemical Company, Inc. ("Solvent") on Solvent's claims against them. Item 1032. Bay State and Sack (collectively, the "Bay State defendants") argue that neither is liable to Solvent under either section 107(a)(3) or section 113(f) of CERCLA. Solvent then filed a cross-motion for summary judgment against Bay State and Sack asserting their liability under CERCLA. Item 1052. Subsequently, the Bay State defendants filed a motion to strike the affidavit of Solvent attorney Christopher Dow, Item 1093, and a motion to strike the affidavit of Solvent's expert, Dr. E. Bruce Nauman. Item 1095.

An order dated August 20, 2001 proposed that if a demand for oral argument was filed, the court would decide whether to hear oral argument or have the matter submitted. Item 1036. There was no demand for oral argument. Having carefully considered the arguments set forth in the papers, the court grants the Bay State defendants' motion for summary judgment and grants their motion to strike the Nauman affidavit, denies Solvent's cross-motion for summary judgment, and denies the Bay State defendants' motion to strike the Dow affidavit.

## BACKGROUND

From 1973 to 1978, Solvent operated a chemical manufacturing facility at 3163

Buffalo Avenue (the "Buffalo Avenue site" or the "site") in Niagara Falls, New York. Item 1056, ¶ 4. Solvent's "principal products of manufacture were various technical and refined grades of chlorinated benzenes and zinc chloride solution." *Id.,* ¶ 12.

In 1983, the State of New York (the "State") brought an action against, *inter alia,* Solvent pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), "seeking recovery of costs incurred and to be incurred, and other relief, in responding to the release or threatened release of hazardous substances at or in connection with the property located at and near 3163 Buffalo Avenue, Niagara Falls, New York...." Item 1056, Ex. 3, p. 2. In December 1996, the State issued a Record of Decision ("ROD") identifying a number of hazardous substances in the soil and groundwater at the Buffalo Avenue site and calling for specific remedial activities to be undertaken there. Item 1056, Ex. 1. Zinc was among the contaminants identified in the ROD. *Id.,* pp. 10–11. Zinc is listed as a hazardous substance pursuant to section 101(14) of CERCLA, 42 U.S.C. § 9601(14). Item 1056, Ex. 2.

In April 1997, Solvent and the State entered into a Consent Decree, in which Solvent agreed to implement the remedy set forth in the ROD. Item 1056, Ex. 3. The Consent Decree was approved by this court on October 8, 1997. Item 655. It reserved Solvent's right to seek contribution against other non-settling parties. Item 1056, Ex. 3, ¶ 47. It also provided that the remedial actions to be undertaken to clean up the site should be conducted in compliance with applicable provisions of CERCLA and the National Contingency Plan, 40 C.F.R. Part 300. *Id.,* ¶ 6. Solvent then proceeded to file third-party actions seeking, *inter alia,* statutory contribution under CERCLA against other alleged owners, operators, transporters, and those who arranged for disposal at the site. Solvent asserts that it has incurred over $4.4 million in response costs at the site, and anticipates that it will incur over $20 million in total response costs. Item 1056, ¶¶ 6, 7.

On April 3, 1998, in its fifth-amended third-party complaint, Solvent impleaded Bay State and Benjamin Sack[1] as third-party defendants, seeking contribution from each of them under CERCLA for a share of the response costs Solvent has and will incur at the site. Item 1056, Ex. 4. The complaint charged Bay State and Sack, and a number of other parties collectively referred to as the "Zinc Waste Generators," *id.,* ¶ 85, with selling zinc wastes to Solvent between approximately 1973 and 1978. *Id.,* ¶ 141. The complaint asserted that when the Zinc Waste Generators provided zinc wastes to Solvent, "they arranged for the disposal of and/or treatment of the Zinc Wastes ... and any hazardous substances contained therein." *Id.,* ¶ 143. The complaint further alleged that the Zinc Waste Generators were unable to use the Zinc Wastes which they sold to Solvent unless they were further processed. *Id.,* ¶ 144. In addition, Solvent claimed that if the Zinc Waste Generators had not provided these wastes to Solvent, "they would have had to otherwise treat or dispose of them." *Id.,* ¶ 145. The Zinc Waste Generators, asserted Solvent, were able to arrange for the disposal of and/or treatment of the zinc wastes and alleged hazardous substances contained therein by selling them to Solvent for a nominal price or giving them to Solvent at no cost. *Id.,* ¶ 146.

In their answer, Bay State and Sack raised thirty-four affirmative defenses. Item 1056, Ex. 5. They did not raise the

---

1. Solvent seeks to hold Benjamin Sack liable individually as a former sole owner, president, and treasurer of Bay State. Item 1113, p. 16.

"useful product" defense,[2] although the thirty-first defense incorporated by reference all applicable defenses set forth in the answers of other third-party defendants. *Id.*, p. 11. Other defendants have included the "useful product" defense in their answers. *See* Item 1000, Ex. 5, p. 19.

The cross-motions for summary judgment primarily concern whether the sales of zinc oxide and zinc skimmings by Bay State to Solvent constituted arrangements for treatment or disposal under CERCLA—which would be an element of CERCLA liability—or sales of a useful product—which would obviate CERCLA liability.

### FACTS

Most of the facts in this case are undisputed; the parties contest the legal significance of those facts.

On December 29, 1967, Sack Smelting Co., Inc., was incorporated by Benjamin Sack and two other incorporators in the State of Massachusetts. Item 1035, Ex. A. On March 26, 1968, Sack Smelting Co., Inc., was granted the right to operate under the name Bay State Smelting Co., Inc. ("Bay State"), while at the same time, under the same Article of Amendment, the "original" Bay State Smelting Co. changed its name to Benjamin Smelting Co., Inc. Item 1033, p. 2, n. 1; Item 1035, Ex. B. Bay State operated from 15A Bleachery Court in Somerville, Massachusetts, from 1968 until its voluntary dissolution in 1996. Item 1035, Ex. C.

Bay State was in the business of smelting non-ferrous metals and trading scrap metals. Item 1056, Ex. 6, pp. 9–10. It "recycled previously manufactured non-ferrous metal products," Item 1032, Sack Aff., ¶ 11. Bay State produced brass and bronze ingots by melting scrap metal in its furnaces, and sold the ingots to various foundries which made brass and bronze metal goods. *Id.* Brass contains zinc; and when brass is melted, a portion of the zinc boils off. Item 1054, ¶ 12. During the smelting process, "[t]he zinc in the flue dust oxidize[s] ... to form zinc oxide." Item 1032, Sack Aff., ¶ 112.

Gerald Sack, son of Benjamin Sack, worked at Bay State from 1964 to 1994 in a number of capacities. Item 1032, ¶ 4. At his deposition, he described Bay State's operations. He explained that the zinc oxide flue dust "was collected in the bag houses [filters] and put into fiber drums. And we had a closed trailer at the doorway of the furnace. And every night they would take the full barrels of the zinc oxide and double stack them into a trailer until the trailer was full." Item 1056, Ex. 6, p. 14. Bay State would then "put a tractor under the trailer and drive it to wherever we sold the bi-product." *Id.*, p. 15. Gerald Sack knew of two customers that bought Bay State's zinc oxide flue dust: Solvent and Madison Industries. *Id.* He also testified that Bay State's Superintendent, Irving Bond, was the person who handled the disposition of the flue dust and the environmental permits. *Id.*, pp. 12, 14.

In his affidavit, Gerald Sack stated that the "zinc oxide material was not melted prior to sale or otherwise processed," and that "Bay State's operations did not produce zinc chloride wastes." Item 1032, Sack Aff., ¶¶ 14, 15. He also stated:

> To my knowledge, Solvent and other zinc oxide customers consistently paid for the zinc oxide, which Bay State collected and sold as a raw material. The sale of zinc oxide from the non-ferrous scrap smelting operations was one of several sources of revenue generated from that business.

. . . . .

---

**2.** See *infra,* Section III(C).

At the time of the zinc oxide sales to Solvent, Bay State would have assumed that the material was being used as a raw material by Solvent.

*Id.,* ¶¶ 16, 19.

Bay State sold zinc oxide flue dust to Solvent from 1974 to 1978. Item 1035, Ex. E. In May 1978, Solvent also purchased materials called "zinc skimmings" or "sal skimmings" from Bay State. *Id.,* pp. 40065, 40067, 40078.

Solvent's weekly production reports detail the ingredients used and costs involved in manufacturing zinc chloride. Item 1035, Ex. E. The production reports consistently list flue dust from Bay State (and other suppliers) as a raw material. *Id.* Often the production reports contain a raw material inventory, and Bay State's (and other suppliers') flue dust is listed. *Id.,* p. 7323. The cost of purchasing zinc oxide was included in Solvent's zinc chloride production cost calculations. *Id.* at p. 4955.

Solvent's production reports also reveal that Solvent paid between $0.03 and $0.08 per pound for Bay State's flue dust. Item 1035, Ex. E. Solvent paid $0.03 per pound for the sal skimmings. *Id.*

In a note on the July 8–July 21, 1974 production report, Kabir Khalid, a Solvent employee, wrote, "Please observe that the unit cost of production is lower than those of previous weeks due to reduced manpower usage. It has been possible to maintain the level of production with reduced manpower because of the excellent quality of flue dust (Bay State) which has made charging of digesters less manhours consuming." Item 1035, Ex. E, p. 7237. There are references in other production reports indicating the good quality of flue dust that Solvent received from Bay State. In the May 25, 1975 raw material inventory, Ranjit Roy wrote that, "[o]f this inventory [a total of 124,900 pounds] only 36,000 lbs of Bay State is good, usable flue dust." Item 1035, Ex. E, p. 5016.

On the other hand, Solvent experienced quality problems with the flue dust it received from other suppliers. A number of production reports indicated that the flue dust shipped from sources other than Bay State was unusable, often because it was wet. Item 1035, Ex. E, pp. 5016, 5030. In another case, the July 6, 1975 raw material inventory had a star next to Purity Zinc's 15,000 pounds of flue dust. The star indicated: "This flue dust is unusable since it contains sulfur compounds which generate $H_2S$ on reaction with acid. $H_2S$ is a toxic gas and inhalation in large amounts can be fatal" *Id.,* p. 5024.

Solvent did complain, however, about the cleanliness of the material supplied by Bay State and other flue dust providers. Ranjit Roy authored an internal memorandum dated February 11, 1975, entitled, "Flue Dust From Sources Such As Bay State Smelting, New England Smelting, etc." He stated that while the flue dusts are "very good in quality" and had "very few other impurities," the dusts from their suppliers were "full of 'junk'—plastic sheets, beer cans, steel plates and other garbage, and this is a major drawback in terms of equipment failure and downtime." Item 1054, Ex. D. Apparently referring to this memorandum, Sanford Schwartzman wrote a memorandum to Solvent President Bertram White, dated February 28, 1975. The memorandum read in part:

In a recent memo Roy requested that we clean up the high quality flue dust received from Bay State. It seems that although the quality of the dust is very good, the cleanliness of the material is awful, and it is contaminated with all sorts of foreign matter that gets caught in our digestor blades and act as knives, rotating on the blades, to destroy our tanks. One possible solution might be to get Bay State to clean up their operation, even if it costs something to accomplish this. The alternatives to this

would be to screen the Bay State flue dust once it arrives. This is a dusty, messy, expensive and *toxic* problem, but must be done if there are no other alternatives.

Item 1054, Ex. E, p. 5

In his affidavit, Gerald Sack explained the corporate structure of Bay State. From the beginning of his employment until the early 1990s, Sack stated that his father, Benjamin Sack, served as President of Bay State. *Id.,* ¶ 7. Gerald Sack served as vice-president but learned on the day of his deposition in March 2001 that he had been made president in 1992. Item 1056, Ex. 6, p. 8. He was not aware of any period of time prior to Bay State's dissolution when his father was the sole officer, director, and shareholder of Bay State.[3] Item 1032, ¶ 9. Gerald Sack averred that Bay State filed annual reports, issued shares of stock, kept corporate books and records, and maintained a corporate bank account during the period of his employment there. *Id.,* ¶ 10. The corporate books and records were included in the assets sold following dissolution of the corporation. *Id.* Bay State's attorney provided copies of Bay State's annual reports for 1992 to 1996, and stated that the Massachusetts Secretary of State was unable to provide him with Bay State's annual reports prior to 1992. Item 1035, ¶ 8, Ex. D.

## DISCUSSION

### I. Legal Standards

#### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Morales v. Quintel Entertainment, Inc.,* 249 F.3d 115, 121 (2d Cir.2001), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (*quoting* Fed. R.Civ.P. 56(e)).

When perusing the record to determine whether a rational fact-finder would find for the nonmoving party, "a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Sorlucco v. New York City Police Department,* 888 F.2d 4, 6 (2d Cir. 1989). The court's function "is not . . . to weigh the evidence and determine the truth of the matter . . . [but] to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The object of summary judgment

---

**3.** Solvent seeks to import facts from *Sack v. Sack,* 328 Mass. 600, 105 N.E.2d 371 (1952), a divorce and support proceeding that took place fifty years ago in Massachusetts. There was some fact-finding in that case concerning Benjamin Sack's relation to Bay State Smelting Co., Inc. Solvent's effort fails, given that those facts are irrelevant to the case at bar, and have no collateral estoppel application here.

"is to discover whether one side has no real support for its version of the facts . . . ." *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir.1962).

> [E]ven when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.

*Morales*, 249 F.3d at 121 (citations omitted).

## B. Standard for CERCLA Liability

■ CERCLA is a broad, remedial statute enacted by Congress in 1980 " 'designed to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten the environment and human health.' " *Mainline Contracting Corp. v. Chopra–Lee, Inc.*, 109 F.Supp.2d 110, 117 (W.D.N.Y. 2000), quoting *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197 (2d Cir.1992). CERCLA ensures " 'that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.' " *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285 (2d Cir.1992), quoting S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), U.S.Code Cong. & Admin.News 1980, 6119, reprinted in 1 CERCLA Legislative History at 320. As a remedial statute, CERCLA is to be liberally construed to give effect to its purposes. *Schiavone v. Pearce*, 79 F.3d 248, 253 (2d Cir.1996).

■ To establish a prima facie cause of action under CERCLA, Solvent must demonstrate that: (1) the defendants are responsible parties as defined under § 9607(a); (2) the site is a facility as defined in § 9601(9); (3) the release or threatened release of hazardous substances at the facility; (4) it incurred response costs in connection with the release; and (5) the cost incurred and response actions taken conform to the National Contingency Plan ("NCP") established under the CERCLA and administered by the EPA.[4] *See Mainline Contracting Corp.*, 109 F.Supp.2d at 117. Upon establishing these elements, the defendant is then strictly liable for the release or threatened release of hazardous substances unless it successfully invokes one of the statutory defenses set forth under 42 U.S.C. § 9607(b).

## II. Motion to Strike the Dow Affidavit

■ The Bay State defendants move to strike paragraphs 3, 6, and 10 through 28 (inclusive) and Exhibit 8 of the affidavit of Solvent attorney Christopher Dow on the grounds that he improperly asserts legal arguments and characterizes evidence, testimony, and documents in the case. Item 1092, p. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), allows an attorney a degree of latitude to characterize the evidence by informing the court of the basis for the summary judgment motion and identifying the relevant portions of the record which he or she believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. Although the court agrees that Mr. Dow has, in a number of instances, character-

---

4. The Bay State defendants have also contested CERCLA liability by charging that Solvent has not established that its response costs were incurred in a manner consistent with the National Contingency Plan. Item 1119, pp. 9–10. There may be some merit to this argument, but the court resolves the issue of liability on the basis that defendants are not responsible parties.

ized the evidence, that characterization will not prejudice this court, which will peruse the documentary evidence and draw its own conclusions based on the evidence, not the attorneys' characterizations of it. *See In re NASDAQ Market–Makers Antitrust Litigation,* 164 F.R.D. 346, 350 (S.D.N.Y.1996).

The Bay State defendants also object to the Dow affidavit, arguing that Rule 56 prohibits an attorney's affidavit from containing legal arguments or factual assertions not made upon personal knowledge. *See Ditullio v. Village of Massena,* 81 F.Supp.2d 397, 403 (N.D.N.Y.2000). This is not the case here. The Dow affidavit is made "on the basis of my personal knowledge of the matters stated, or on the basis of Court papers, discovery or other documents in this proceeding." Item 1056, ¶ 1. Mr. Dow has not testified as to facts at issue in this case, but rather refers to various documents or relevant portions of sworn testimony of witnesses with personal knowledge, and places them before the court. There are, as the Bay State defendants point out, similarities between Solvent's memorandum of law and the Dow affidavit.[5] But given the complexity of this case, and the numerous documents and pages of testimony that have been generated during the discovery process, Mr. Dow's affidavit presents the evidence in a cohesive manner. *See Moore's Federal Practice* § 56.14[1][c], pp. 56–160 ("In some instances, counsel may be in a position to provide an affidavit which presents admissible evidence, for example, if the attorney evidence relates to matters in the case, such as items in the record or items produced in discovery.")

5. The repetition of various facts and/or arguments does not give them additional force.

6. The useful product defense, set forth by the defendants, is the mirror image of arranger liability, which the plaintiff seeks to prove. Cases which discuss the useful product de-

On the basis of the foregoing, the court denies the Bay State defendants' motion to strike the Dow affidavit and/or certain exhibits attached to the affidavit. Item 1094.

### III. Cross–Motions for Summary Judgment on the Issue of Arranger Liability and the Motion to Strike the Nauman Affidavit

#### A. Introduction

The parties sharply disagree as to whether the zinc oxide flue dust provided to Solvent by Bay State constituted a commercially viable product or a waste. This issue lies at the heart of the cross-motions for summary judgment. If the zinc oxide flue dust is a useful product, Bay State cannot be found to have arranged for disposal or treatment of hazardous substances.[6] In that event, Solvent would not be able to make a *prima facie* case against them because they would not be responsible parties under the statute. The useful product doctrine would thus bar both Bay State's and Sack's liability. If Solvent fails to establish liability under section 107, it could not then seek contribution under section 113. *Warwick Admin. Group v. Avon Products, Inc.,* 820 F.Supp. 116, 122 (S.D.N.Y.1993) ("a party cannot be liable for contribution unless it is a responsible party as defined by § 107.") (citation omitted).

The Bay State defendants assert that the transactions at issue involved their sale of raw materials to Solvent which Solvent used, as is, to manufacture a commercial product.

fense also often discuss the elements of arranger liability, since an analysis as to whether a material is a product or a waste is common to both. A plaintiff may charge a defendant with arranger liability, but that defendant does not necessarily always invoke the useful product defense.

Solvent's case rests on the affidavit submitted by Dr. E. Bruce Nauman, Solvent's expert.[7] Dr. Nauman asserts that the zinc-containing materials purchased by Solvent from Bay State Smelting were waste. He concludes that Solvent reprocessed the materials and, in so doing, allowed Bay State to avoid either reprocessing the materials internally or disposing of them as a waste. Item 1054, ¶ 18.

## B. Arranger Liability

The core issue in the summary judgment cross-motions is whether the Bay State defendants qualify as responsible parties under CERCLA. The CERCLA statute establishes four classes of persons who may be held responsible for costs incurred in responding to releases or threatened releases of hazardous substances:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity at any facility owned or operated by another party or

entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a). As indicated above, the plaintiff has to prove that the defendant fits into one of these categories in order to be liable. Once liable, 42 U.S.C. § 9613(f) provides that "any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . . ."

In order to understand the "useful product" defense asserted by the Bay State defendants, it is necessary to first understand the contours of arranger liability. The wording of the statute describing arranger liability makes reference to "arrang[ing] for" "disposal" or "treatment" of "hazardous substances." If a party is found to have met the definitions of these terms, it is liable as an arranger.

CERCLA defines the terms "disposal" and "treatment" using the definitions contained in the Solid Waste Disposal Act (SWDA), 42 U.S.C. § 9601(29).[8] Key to these definitions is the fact that some sort of *waste* is being *discarded.* The SWDA's definition of *treatment*

---

7. Solvent has submitted no other affidavits in support of its summary judgment motion and/or in opposition to Bay State's summary judgment motion. The only other evidence submitted by Solvent is the exhibits to the Dow affidavit, Item 1056.

8. The Solid Waste Disposal Act, 42 U.S.C. § 6903(34), defines treatment as: "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutral-

ize such waste or so as to render such wastes nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume." Disposal is defined in 42 U.S.C. § 6903(3) as: "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

"presupposes discard." Had the authors of CERCLA intended *not* to adopt the presupposition of SWDA, they were certainly capable of defining "treatment" otherwise.... Therefore, "treatment ... of hazardous substances" as used in CERCLA refers to a party arranging for the processing of discarded hazardous substance[s] or processing resulting in the discard of hazardous substances. *Pneumo Abex v. High Point Thomasville & Denton,* 142 F.3d 769, 774 (4th Cir.1998), *cert. denied,* 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998). Similarly, courts "have construed 'disposal' for purposes of section 107(a)(3) as referring only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *3550 Stevens Creek Assoc. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1362 (9th Cir.1990). *See also Freeman v. Glaxo Wellcome, Inc.,* 189 F.3d 160, 164 (2d Cir.1999).

By contrast, the term "arrange for" is not defined in CERCLA. "However, a liberal judicial interpretation of the term is required in order to achieve CERCLA's 'overwhelmingly remedial' statutory scheme." *United States v. Pesses,* 794 F.Supp. 151, 157 n. 21, citing *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990).

To determine whether arranger liability may be found, the facts and circumstances in each case must be carefully examined. Quoting *Florida Power & Light,* 893 F.2d at 1317, the *Glaxo Wellcome* court set forth the rule agreed upon by the many courts that have grappled with arranger liability: " 'Whether an "arrangement for" disposal exists depends on the facts of each case....' " 189 F.3d at 164. No one factor determines arranger liability in this "product versus waste" fact-intensive inquiry. The

imposition of statutory liability for disposal depends upon examining the transaction with respect to the transfer of the hazardous substance to see if it involved the sale of a product rather than a disposal arrangement.

. . . . .

... [T]he court must examine the character of the transaction to determine whether or not a statutorily defined disposal has occurred.

*Prudential Ins. Co. of America v. U.S. Gypsum,* 711 F.Supp. 1244, 1253, 1254 (D.N.J.1989).

■ When surveying definitions of the phrase "arranged for," the *Glaxo Wellcome* court quoted *State of New York v. General Elec. Co.,* 592 F.Supp. 291, 297 (N.D.N.Y.1984), for the holding that "a waste generator's liability under CERCLA is not to be ... facilely circumvented by its characterization of its arrangements as 'sales.' " *Id.* Thus, the rule governing arranger liability in this circuit is, " '[i]f a party merely sells a product, without additional evidence that the transaction includes an "arrangement" for the ultimate disposal of a hazardous substance, CERCLA liability [will] not be imposed.' " *Freeman v. Glaxo Wellcome, Inc.,* 189 F.3d at 164, quoting *Florida Power & Light,* 893 F.2d at 1317.

To determine whether an arrangement for disposal of a hazardous substance exists, courts have variously assessed the nature of the transactions between the parties, and have ruled accordingly. Among the matters courts have found significant in making this determination have been:

the party's knowledge of and control over the disposal, ownership of the hazardous substance at the time of disposal, and the intent of the party; the purpose and inevitable consequences of the

transaction and whether the product had value on the market; whether the substance had a productive use or was more properly characterized as waste to be gotten rid of; whether the substance was manufactured as a principal business product or a by-product, and whether, before or after the transaction in issue, the seller disposed of the substance as waste; and whether an already used product which has further usefulness is being sold for the same use for which it was manufactured.

*United States v. American Cyanamid Co., Inc.,* 1997 U.S.Dist. LEXIS 4413 (S.D.W.Va, 1997) at *16–17 (citations omitted).

Courts consider

the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, the value of the materials sold, the usefulness of the materials in the condition in which they were sold, and the state of the product at the time of transferral (was the hazardous material contained or leaking/loose).

*Pneumo Abex,* 142 F.3d at 775, citing cases.

### C. Useful Product Defense

The Bay State defendants argue that the material shipped to Solvent was raw material, not waste, used by Solvent to manufacture a commercial product. They assert that they are thus entitled to rely on the "useful product" defense to arranger liability.

Simply put, if the material at issue is "a useful product, then it [is] not waste and not subject to CERCLA." *A & W Smelter and Refiners, Inc. v. Clinton,* 146 F.3d 1107, 1112 (9th Cir.1998).

▮▮▮ Just as the sale of a material does not mean that the transaction is not an arrangement for disposal, the fact that a substance is hazardous does not mean that it cannot also be a useful product. "[A]rranger liability may be defeated when a defendant asserts and proves it was not disposing of, or delivering for treatment, a hazardous substance, but was selling a useful product." *RSR Corp. v. Avanti Development, Inc.,* 68 F.Supp.2d 1037, 1043 (S.D.Ind.1999).

[A] party's characterization of its hazardous substance transaction as a sale does not automatically preclude a finding that the party is a responsible person under Section 9607(a). Selling hazardous substances as part of a complete, useful product does not generally make a party a responsible person. Neither does selling a useful ingredient in a manufacturing process. However, a party is a responsible person when a transaction—even though characterized as a "sale"—is a sham for a disposal.

*United States v. Petersen Sand & Gravel, Inc.,* 806 F.Supp. 1346, 1354 (N.D.Ill.1992) (citations omitted). *See also Prudential,* 711 F.Supp. at 1254 ("the sale of a hazardous substance for a purpose other than its disposal does not expose defendant to CERCLA liability"); *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (finding no liability based on the intent of the parties and the fact that transformers were a valuable commodity, despite the fact that transformers contained hazardous substances); *AM Int'l Inc. v. Int'l Forging Equipment Corp.,* 982 F.2d 989, 999 (6th Cir.1993) (focusing on the value and usefulness of the materials sold and the intended purpose to find no liability for sellers of chemicals). *American Cyanamid* notes that

the useful product defense is not applicable when the product is deemed to be waste and of no further use to the seller and when it can be shown that the seller's motivation was to get rid of the product, even though the buyer makes

further use of the product and pays valuable consideration for it.

1997 U.S.Dist. LEXIS 4413 at *16.

In this circuit, Judge McAvoy addressed the useful product defense in *Cooper Indus., Inc. v. Agway, Inc.*, 987 F.Supp. 92 (N.D.N.Y.1997). He held that "CERCLA liability may not attach if a transaction involves the sale of a new useful product containing a hazardous substance, as opposed to the sale of a substance merely to 'get rid of it.'" *Id.* at 108 (quotation and citations omitted). In *Cooper Industries*, regardless of the fact that the scrap steel at issue could be reclaimed or recycled, it was the intention of the seller "to get rid" of the steel, which was held to be waste. *Cooper Industries* reiterates the importance of the concept of disposal, or "getting rid of," an unwanted material when ascertaining whether the useful product defense applies or whether an arrangement for disposal exists.[9]

In this case, the issue on summary judgment is whether Bay State intended[10] to "get rid of" its material by selling it to Solvent.

### D. Application of the Useful Product Defense

#### 1. Disposal

As indicated *supra*, one of the most important factors in determining whether material is classified as a useful product or a waste is an analysis of whether the party that sold the material wanted to "get rid of it."

■ Bay State "collected and sold [zinc oxide] as a raw material." Item 1032, Sack Aff., ¶ 16. The zinc oxide collected in the bag house filters was sold "as is" to Solvent: it "was not melted prior to sale or otherwise processed." *Id.*, ¶ 14. Solvent does not dispute this point.[11] According to

9. Courts in other circuits have articulated this requirement as: "Disposal refers only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *Catellus*, 34 F.3d at 750; *See also AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir.1993). Compare *Concrete Sales & Services, Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1337 (11th Cir.2000) (court found no evidence to establish that defendant "took any action or had any intent to dispose of hazardous substances") with *A & W Smelter and Refiners, Inc. v. Clinton*, .146 F.3d 1107, 1113 (9th Cir.1998) (defendant attempted to dispose of the material in a municipal landfill before contracting with transporter, suggesting that it was waste).

10. Courts have differed in their opinions concerning whether a party must have *intended* to arrange for disposal or treatment of a hazardous substance in order to be subject to arranger liability. Some have reasoned that because CERCLA is a strict liability statute, the parties' intent is irrelevant (*Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1138 (N.D.Fla.1994)), while others have found that the CERCLA statute required an intent to arrange for disposal, despite its status as a strict liability statute. *United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227, 1231 (6th Cir.1996). Although the Second Circuit has not directly addressed the issue of intent, it appears to align itself with the majority of courts that consider the intent factor when examining a transaction. See *Glaxo Wellcome*, approvingly citing *AM Int'l, Inc. v. Int'l Forging Equipment Corp.*, 982 F.2d 989, 992, 999 (6th Cir.1993), for its holding that "a transfer of chemicals as part of a bulk sale of assets on an 'as is, where is basis' was not an arrangement for disposal where the chemicals were useful and valuable and the parties *intended* that they would be used in a particular manner." *Glaxo Wellcome*, 189 F.3d at 164 (emphasis added). Also, the *Cooper Industries'* court found that the defendant's "purpose for entering into [the] arrangement was to remove the scrap steel from its property" in finding the useful product defense did not apply. 987 F.Supp. at 107.

11. Solvent claims the material had to be screened. Screening is neither processing nor treatment. See *infra*, Section III(E)2(b) and (c).

Gerald Sack, Bay State's sales of zinc oxide "from the non-ferrous scrap smelting operations was one of several sources of revenue generated from that business." *Id.*, ¶ 16. Mr. Sack assumed that Solvent was using the zinc oxide as a raw material, *id.*, ¶ 19, an assumption which Solvent has not effectively challenged.

Solvent and other zinc oxide customers "consistently paid [Bay State] for the zinc oxide, which Bay State collected and sold as a raw material." *Id.*, ¶ 16. Furthermore, Bay State was one of a number of suppliers from which Solvent purchased zinc oxide, indicating a market for this material. Item 1035, Ex. E. Solvent purchased "flue dust" from Kearny Smelting, Riverside Smelting, Benjamin Harris, MRM, Ingot Metal, Cero Metals, Purity Zinc, Anaconda Brass, as well as from Bay State. Solvent's Production Reports consistently list the flue dust from Bay State and the other suppliers as a "raw material." *Id.* The cost of the zinc oxide was included in Solvent's production costs for its final product, zinc chloride, which it then sold to various customers. *Id.* Clearly, if Solvent did not consider the zinc oxide useful, it would not have continued to purchase it from Bay State and the many other suppliers over a time period from at least July 1974 to March 1976. Item 1035, Ex. E.

### 2. Other factors

Some courts, considering what constitutes usefulness of an allegedly useful product, have analyzed this issue by "looking at the product's marketability and the consumer demand for the good, in addition to its functionality." *RSR Corp.*, 68

F.Supp.2d at 1045. In the case at bar, there is ample evidence of (a) the product's marketability, (b) Solvent's and at least one other company's demand for Bay State's product, and (c) its functionality as a raw material in the Solvent process. The fact that the zinc oxide was a by-product or co-product [12] of the smelting process does not lead to the conclusion that the material was a waste, given that the evidence shows the by-product or co-product in Bay State's chemical process was a useful raw material in Solvent's chemical process. *See A & W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1112 (9th Cir.1998) ("The hard cases occur when a company uses the by-products of its main manufacturing process, or sells them for use by others—*i.e.*, when it uses waste products as the raw material for further processing.").

The evidence Solvent provides, in its effort to raise a genuine question of material fact in opposition to Bay State's summary judgment motion, and in order to support its own motion for summary judgment on the basis of arranger liability, is found in the Nauman affidavit.

### E. Motion to Strike the Nauman Affidavit

█ The Bay State defendants have moved to strike the affidavit of Solvent's expert, Dr. E. Bruce Nauman. Item 1096. They argue that Dr. Nauman "(1) has no personal knowledge of the transactions at issue in this case; (2) has no knowledge, skill, experience, training or education with respect to the manufacture, purchase, sale or marketing of zinc oxide or zinc chloride; and (3) . . . [his] opinions are little more

---

12. "By-product" and "co-product" are defined in 40 C.F.R. § 261.1(c)(3). A by-product is "a material that is not one of the primary products of a production process and is not solely or separately produced by the production process. Examples are process residues such as slags or distillation column bottoms. The term does not include a co-product that is produced for the general public's use and is ordinarily used in the form it is produced by the process."

than restatements of inadmissible hearsay." Item 1097, pp. 1–2. They point out that because Dr. Nauman has no academic or professional expertise regarding metals reclamation, zinc oxide markets, or market analysis, he is not qualified as an expert. *Id.*, pp. 4–5. They charge that his conclusions are neither helpful nor relevant because they do not address how Solvent or Bay State viewed their commercial dealings with each other, which is an essential consideration in assessing the useful product doctrine. *Id.*, pp. 5–6. Also, they challenge certain exhibits attached to the Nauman affidavit as unauthenticated.[13] *Id.*, p. 3.

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. The witness may then give opinion testimony relating to "scientific, technical, or other specialized knowledge" if it will "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." *Id.* The trial court is thus vested with the role of "gatekeeper," ensuring that any scientific testimony admitted is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). If the court finds that an expert is not qualified, or that the expert's affidavit is neither relevant nor reliable, it may strike the affidavit. *In re Air Disaster*, 37 F.3d 804, 824 (2d Cir.1994) (district court may exclude "unhelpful" expert testimony under Fed.R.Evid. 702).

## 1. Dr. Nauman's Qualifications

 The Second Circuit has construed expert qualification requirements liberally. "Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Lappe v. American Honda Motor Co., Inc.*, 857 F.Supp. 222 (N.D.N.Y.1994) (footnote omitted). "Accordingly, assuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Canino v. HRP, Inc.*, 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) (citations omitted).

 Dr. Nauman holds both M.S. and Ph.D. degrees in Chemical Engineering. Item 997, ¶ 2. He has been a professor of Chemical Engineering at Rensselaer Polytechnic Institute ("RPI") since 1981. *Id.*, ¶ 3. His expertise is in chemical reaction engineering. *Id.*, ¶ 5. For thirteen years prior to his academic career, Dr. Nauman worked as Product Manager at Union Carbide Corp. *Id.*, ¶ 4. He has set or negotiated product specifications and prices, and has negotiated distributor discounts. *Id.*, ¶ 8.

The Bay State defendants have not challenged Dr. Nauman's qualifications on the basis of inadequate education in chemical engineering. Rather, they argue that he should not be classified as an expert because he has no experience in marketing zinc oxide. As outlined above, however,

---

**13.** Regarding the challenged documents, a motion to strike may be granted when it challenges documentary evidence submitted in support of or in opposition to a motion for summary judgment, but which has not been properly authenticated. *Dedyo v. Baker Eng'g New York, Inc.*, 1998 WL 9376 at *4–5 (S.D.N.Y. Jan.13, 1998), citing 11 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.14[4][a] (3d ed.1997). However, Solvent, through the affidavit of Irwin F. Roth, provided proper authentication for the documents. Item 1115. Thus, the court will not strike the challenged documents.

courts have not required such narrowly tailored specialization in assessing an individual's qualifications as an expert. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995). The processes which generate zinc oxides involve chemical reactions, and thus fit within Dr. Nauman's general expertise and experience, gained from both his academic and chemical industry positions. The Second Circuit has stated that disputes as to the strength of the expert's credentials, training, or knowledge on specific points "may properly be explored on cross-examination at trial and thus go to the weight and credibility of the expert's testimony, not admissibility." *Canino*, 105 F.Supp.2d at 28.

The court finds that Dr. Nauman's knowledge, experience, training, and education render him sufficiently qualified as an expert to offer his opinion regarding the product-versus-waste controversy in this case.

## 2. Reliability and Relevance

Having determined that Dr. Nauman is qualified to testify as an expert, the court's next "gatekeeping" inquiry is to determine whether the expert's proposed testimony will assist the trier of fact to understand the evidence or determine a fact in issue. Rule 702; *Bunt*, 962 F.Supp. at 317. Dr. Nauman concludes that:

> The zinc-containing materials purchased by Solvent from Bay State Smelting were waste that lacked significant value compared to prevailing market values of standard grades of zinc oxide. I thus conclude that Solvent was acting as a reprocessor of these zinc-containing materials and, in so doing, performed a function that was economically beneficial to Bay State Smelting who avoided reprocessing the materials

internally or disposing of them as a waste.

Item 1054, ¶ 18.

 For the reasons explained below, the court finds Dr. Nauman's opinions unreliable and unhelpful in attempting to understand the evidence or in determining facts in issue in this case. FRE 702, *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

In *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir.1989), the Seventh Circuit interpreted Rule 56(e)'s provision to "set forth specific facts" in affidavits supporting and opposing a motion for summary judgment as requiring experts to set forth their processes of reasoning in their affidavits. *Id.* at 1339. The *Mid–State* court rejected an expert's affidavit that rendered seven one-sentence conclusions without providing any facts, any hint of the inferential process underlying the conclusions, or any discussion of hypotheses considered and rejected. *Id. See Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 829 (D.C.Cir. 1988) (holding that an expert's declaration, full of assertion but empty of facts and reasons, will not get a case past a motion for summary judgment, for the judge must "look behind [the expert's] ultimate conclusion . . . and analyze the adequacy of its foundation.").

Other courts have rejected an expert's opinion and stricken the expert's affidavit if it fails to measure up to the standard of Rule 702. *See Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 529 (S.D.N.Y.2001) (If an expert "fail[s] to establish a basis for his opinion," where his report and affidavit "offer credentials rather than analysis," and the opinions are merely conclusory, a court is within its discretionary power to strike the affidavit as being unreliable and unhelpful); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir.1995) (the proffered expert opin-

ions are conclusory and would not " 'assist the trier of fact to understand the evidence or to determine a fact in issue' " (quoting Fed.R.Evid. 702)).

In contrast, the Second Circuit declined to apply *Mid–State's* reasoning in I*acobelli Construction, Inc. v. County of Monroe,* 32 F.3d 19 (2d Cir.1994), and found that the experts' affidavits "described industry practices and customs, defined terms of art used in the industry, explained the approach by which reasonably prudent contractors would interpret the contract documents, and enumerated the conclusions such reasonably prudent contractors would reach." *Id.* at 25.

Dr. Nauman's affidavit falls somewhere between *Iacobelli* and *Mid–State,* but so much closer to *Mid–State* in terms of the minimalism of the analysis that it warrants being stricken.

Dr. Nauman concludes that the flue dust shipped to Solvent was waste based upon: (1) its price; (2) its contamination by foreign matter; (3) and the fact it had to be "reprocessed" and ultimately "disposed." In arriving at this conclusion, he considered papers submitted in the lawsuit, deposition transcripts of Bay State employees and other zinc oxide suppliers, information in the open literature on the zinc oxide manufacturing process and pricing, and his own books and publications. Item 1054, ¶ 10.

The court finds that Dr. Nauman has arrived at a legal conclusion in the guise of scientific expert opinion. An examination of the reasoning and evidence ostensibly supporting these three factors provides no basis for his conclusion, warranting exclusion of his affidavit.

**(a) Price**

Dr. Nauman's opinion that the zinc material was waste is based upon the price Bay State sold the material for, contrasted with the prices for zinc oxide listed in the *Chemical Market Reporter* magazine. He asserts that Solvent purchased flue dust from Bay State between 1974 and 1978 "for prices ranging from $0.03 to $0.08 per pound," but during that same period of time, the *Chemical Market Reporter* price for zinc oxide ranged from $0.19 to $0.46 per pound. Item 1054, ¶ 16, Exs. C and J. Based on this information, Dr. Nauman concludes: "The zinc-containing materials purchased by Solvent from Bay State Smelting were waste that lacked significant value compared to prevailing market values of standard grades of zinc oxide." Item 1054, ¶ 18.

Exhibit C, which Dr. Nauman apparently compiled, is entitled "Historic Prices for Zinc Oxide." Item 1054, Ex. C. There are two columns for prices, one labeled "Low" (apparently meaning low price range), and one labeled "High" (meaning high price range). There is also a "Date" column, which lists two dates from each year between 1970 and 1979. In his affidavit, Dr. Nauman states: "Selling prices vary by grade over a wide range as shown in *Exhibit C . . . .* " Item 1054, ¶ 13. Yet, there is absolutely no indication of gradation in Exhibit C, much less a description of what the "standard grades" of zinc oxide are and what each grade may sell for. There is only a high and a low price, and what that price reflects is not clear.

Dr. Nauman's Expert Report, which devotes only six paragraphs to "Copper Alloy Recycling" (referring to zinc oxide) and 42 paragraphs to chlorobenzenes, also does not elucidate how he arrived at this conclusion. Item 1114, Ex. A. Although Dr. Nauman purports to base his opinion on "accepted standards established by the industry," Item 1054, ¶ 11, he does not provide any explanation of what the industry standards may be for various grades of zinc oxide that would lead to the conclusion that the material provided by Bay State is "waste." He provides no information con-

cerning how the zinc oxide material produced by Bay State differs in quality from the least expensive grade of zinc oxide other than the price. This kind of superficial analysis is not helpful. There is only a price differential, and that is only one element that courts evaluate, in context, to determine if a material is a product or a waste. In *United States v. Petersen Sand & Gravel*, 806 F.Supp. 1346, 1354 (N.D.Ill. 1992), the court focused on the usefulness of the product, the valuable consideration given, and the intent that the product would be used for the purpose for which it was sold, and found no liability. *See also AM Int'l, Inc. v. Int'l Forging Equipment Corp.*, 982 F.2d 989, 999 (6th Cir.1993).

The fact that Solvent bought zinc oxide from Bay State at below market prices does not, by itself, prove that the material was a waste. It is equally likely that, for business reasons, Solvent received the material at a bargain price. If Bay State had considered the material as waste, one logically would think that it would have paid Solvent to dispose of it.

Dr. Nauman's rebuttal affidavit, Item 1114, ¶ 24, does not provide any additional insight into his conclusions. It buttresses the credibility of the *Chemical Market Reporter* and the accuracy of the prices for various chemicals that it lists, Item 1054, ¶¶ 11–15, but it does not shed any light on the various "grades" of zinc oxide that the magazine lists or that Solvent uses. This causes the court to question the reliability of the analysis leading to Dr. Nauman's conclusion: "My opinions in this case are based on large deviations from the list prices for the least expensive grade of zinc oxide." Item 1114, ¶ 15.

### (b) Contamination

Dr. Nauman points to Exhibits D and E attached to his affidavit as providing the basis for his conclusion that the flue dust "was treated as a waste." Exhibit D was a Solvent intra-company memorandum entitled "Flue Dust from Sources such as Bay State Smelting, New England Smelting, etc." authored by Ranjit Roy to Sanford Schwartzman, dated February 11, 1975. While praising the quality of the flue dust, Mr. Roy pointed out that the dusts were "full of 'junk'—plastic sheets, beer cans, steel plates and other garbage, and this is a major drawback in terms of equipment failure and downtime." Item 1054, Ex. D. Exhibit E is a memorandum from Mr. Schwartzman to Bertram White detailing his trip to the Solvent plant. At the end of the section that referred to the plant's zinc chloride production, Mr. Schwartzman referred to the Roy memorandum, which noted that while the quality of the material is very good, "the cleanliness of the material is awful, and it is contaminated with all sorts of foreign matter...." Item 1054, Ex. E, p. 5. (*See supra,* Facts section.) Based on the Roy and Schwartzman memoranda, and a dust analysis memorandum which indicated that one flue dust supplier, ASARCO, shipped flue dust in "Purina Dog Chow bags,"[14] Item 1054, Ex. F, Dr. Nauman concluded that the zinc oxide suppliers "treated [the material] as a waste," as "valueless." Item 1054, ¶ 13.

Dr. Nauman's conclusions are non-sequiturs, both factually and legally. First, the fact that the flue dust from numerous suppliers contained garbage does not lead to the conclusion that the suppliers regarded the material as a waste,[15] as that term is

---

14. This fact is irrelevant to the arranger liability issue between Solvent and Bay State.

15. A "solid waste" is any discarded material that is not excluded by § 261.4(a) ... 40 C.F.R. § 261.2(a)(1). A discarded material is any material which is ... [c]onsidered *inherently waste-like....* 40 C.F.R. § 261.2(a)(2)(iii). Solid wastes which are not hazardous wastes include garbage and solid waste from commercial or industrial sources

used in CERCLA litigation, or as valueless, given that the suppliers sold and Solvent paid from $700 to $3000 per week for flue dust. Item 1035, Ex. E. CERCLA involves the discard of hazardous substances, and the plastic sheets and beer cans contained in the dust do not cause site contamination, nor do they transform Bay State's admittedly high quality product into a waste.

Treatment, as used in CERCLA litigation, does not entail removing garbage from otherwise useable material. For example, in *Cadillac Fairview/California, Inc. v. United States,* 41 F.3d 562, 565 (9th Cir.1994), treatment consisted of re-distilling contaminated styrene to remove the contaminants. This comports with the definition of treatment (*see* footnote 8, *supra*), which involves changing the character of any hazardous waste so as to neutralize it or render it nonhazardous. Screening garbage is not "treatment" under CERCLA. The removal of beer cans, etc., is a mechanical, not a chemical, operation.

Although some of the flue dust from Bay State and the other suppliers contained garbage, there is no evidence as to how that issue was resolved. In the record, there is no communication from Solvent to Bay State complaining about the trash. There is no evidence that the garbage in the zinc oxide continued to be a problem. Solvent, in its papers, claims that it "had to screen out the various types of garbage found in the zinc oxide flue dust," Item 1113, p. 9, even though the memorandum upon which that statement is based indicated that Solvent was considering alternatives, including screening, but had not implemented them. Of note is the fact that Solvent continued to buy the zinc oxide even though there was trash in it, and apparently made no recommendation to terminate purchase. There is no evidence

to show that Bay State sent the flue dust to Solvent for the purpose of having the foreign objects screened out. The fact that the flue dust from Bay State and other suppliers contained garbage does not lead to the conclusion that Bay State sold its zinc oxide to Solvent as waste in order to dispose of it.

To support his conclusion, Dr. Nauman cites a number of non-relevant facts which do not create a genuine question of material fact—*i.e.,* deposition testimony from employees of other zinc oxide suppliers which indicate that the income derived from selling zinc oxide was an insignificant portion of their business. Item 1054, ¶ 14, Exs. G and H. These statements have no bearing on how Bay State viewed its business arrangement with Solvent. Still, even if the sales were relatively insignificant to both Bay State and Solvent, that does not lead to the conclusion that the material sold was waste.

The court agrees with Bay State that this situation is akin to the one described in *Pneumo Abex Corp.* There, the plaintiff sent used wheel bearings, which contained dirt and grease, to a foundry. The old bearings were melted down, and new bearings were produced from that metal. The Fourth Circuit, examining the transaction, found that the removal of the dirt and grease contaminants was not the purpose of the transaction. "The removal of the dirt and grease was incidental to remolding new bearings, just as it would have been incidental to the molding of new bearings from virgin materials. Moreover, the dirt and grease were not the hazardous materials, the metals themselves were." 142 F.3d at 775. Similarly, in this case, the zinc was the hazardous material, not the trash. Further, there is no indication that Solvent was required to, and actually did, "treat" the flue dust prior to combin-

that does not contain hazardous waste. 40 C.F.R. § 261.4(b)(1) and (b)(1)(i)(B).

ing it with muriatic acid to produce zinc chloride.

### (c) "Reprocessing" and "Disposal"

Yet another conclusion for which Dr. Nauman provides absolutely no factual support is his statement that "Solvent *reprocessed* zinc-containing materials by reacting them with hydrochloric acid (a.k.a. muriatic acid) to produce solutions of zinc chloride." Item 1054, ¶ 17 (emphasis added). He adds that Solvent's reprocessing of the zinc-containing materials "performed a function that was economically beneficial to Bay State Smelting who avoided reprocessing the materials internally or disposing of them as a waste." *Id.*, ¶ 18.

Dr. Nauman does not define "reprocessing," which is a critical deficiency. It is clear that Bay State heated copper and brass in its furnace, and zinc was produced as a by-product or co-product which became zinc oxide upon exposure to air. Assuming "reprocessing" has its plain meaning, *i.e.*, "[t]o subject (something) to a special process again" (Oxford English Dictionary Online, Oxford Univ. Press, 2002), there is no evidence to show that Solvent further refined or "reprocessed" the zinc oxide once it was received.[16] What Solvent did do was use the zinc oxide as a raw material, combining it with muriatic acid to form a new finished product, zinc chloride. To combine two raw materials in a chemical reaction to form a new material does not conform with the plain meaning of "reprocessing." It is simply manufacturing.

What this court finds surprising is that Dr. Nauman did not detail Solvent's zinc chloride [17] manufacturing process. There is no scientific explanation of what happened to the zinc oxide upon arrival at Solvent, *i.e.*, whether it had to be further refined or whether it had to be screened. This explanation would have both assisted the court in assessing the summary judgment motion, and would have provided a basis for the court to determine the reliability of Dr. Nauman's opinion. Without such an explanation, his conclusion that the zinc oxide was "reprocessed" is without foundation, and totally unhelpful to the court [18].

■ In his rebuttal affidavit, Dr. Nauman attempts to salvage his theory by showing that he provided an evidentiary basis for his statement that the zinc oxide required "reprocessing." He states: "[T]he concept of reprocessing as a means of waste disposal was discussed at length in my Expert Report, *e.g.*, in paragraphs 29, 50, 51, and 59." Item 1114, ¶ 18. However, paragraphs 29, 50, and 51 concern Solvent's chlorobenzene production process, not its zinc oxide process, and there are marked dissimilarities between the two. Paragraph 59 is simply a conclusory statement about reprocessing at the end of the Copper Alloy Recycling section of the expert report. "The expert must explain how and why he reached his conclusion, and courts do not have to credit opinion evidence connected to data only by the ipse dixit of the expert." *Prohaska v. Sofamor, S.N.C.*, 138 F.Supp.2d 422, 437–

---

16. The type of screening contemplated here, if it in fact occurred, would not fit within the definition of reprocessing.

17. In contrast, his expert report goes into detail about Solvent's chlorobenzene manufacturing process. The contrast in treatment is worthy of notice.

18. Nor is there evidence that the zinc oxide had to be "treated" as the term is used in CERCLA: changing the character or composition of a hazardous waste in order to neutralize it or render it nonhazardous. The transformation of zinc oxide to zinc chloride does not change its hazardous character, as zinc remains a key ingredient, and zinc is a hazardous substance.

38 (W.D.N.Y.2001), quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Dr. Nauman has provided an *ipse dixit* explanation, and the court does not credit it.

On the issue of "disposal," Dr. Nauman seeks to buttress his opinion that the zinc oxide was waste by citing an "Inventory Valuation Worksheet" as of December 31, 1977, which he attached as Exhibit K to his affidavit. He states:

"In 1977, Solvent assigned zero value to 51,700 pounds of zinc oxide, 82,250 pounds of zinc skimmings and 2,100 pounds of zinc dust that it had in inventory.... Solvent described these materials as 'odds and ends' with no value that it may have to pay to others to dispose." Item 1054, ¶ 16. Dr. Nauman relies upon this document to support his conclusion that Solvent's "reprocessing" of the zinc oxide allowed Bay State to avoid "disposing of [the zinc-containing materials] as a waste." *Id.,* ¶ 18. Based on this document, Solvent concludes that "Bay State's by-products as sold to Solvent had no productive use and therefore Solvent had to dispose of or treat these materials." Item 1053, p. 16. Solvent claims this evidence shows "the ultimate disposal of unsuitable or unused material." Item 1113, p. 31.

Once again, the absence of helpful analysis on this point by Dr. Nauman undermines Solvent's case. In comparison to his carefully considered analysis of what constituted "disposal" in relation to Solvent's chlorobenzene production (*see* Expert Report attached as Exhibit A to Rebuttal Affidavit, Item 1114), there is absolutely no reference, other than a conclusory statement based on an incomplete and ambiguous exhibit, to the chemical process involving zinc chloride which would illustrate that, by itself, zinc oxide flue dust

could not be used and would require disposal. He states that "[r]ecognition of waste streams is a technical issue for which general chemical engineering skills are appropriate," Item 1114, ¶ 5, but does not elucidate what constitutes a waste stream in zinc chloride production.

If Dr. Nauman relied on this exhibit in arriving at his conclusion, it does not support his contention that the flue dust and sal skimmings were waste that had to be ultimately disposed of. The exhibit lists thirty-five different chemicals, and the final inventory in pounds. In the comments section, the exhibit states:

These materials are miscellaneous odds and ends we used at one time when processing zinc chloride manufactured zinc ammonium chloride and various operating supply materials which we no longer have a use for. We feel that perhaps we may be able to sell some of these materials and may have to pay to have others disposed of. Therefore we place no value nor a liability on the materials contained on

Item 1054, Ex. K. The last sentence ends in mid-sentence. The text leads a reader to conclude that Solvent's production of zinc chloride could have ceased,[19] the market or practice in the industry could have changed, or that Solvent may have decided to go out of business, all of which would cause Solvent to consider options relating to what to do with the materials on hand. These possibilities could have had a bearing on the creation of this exhibit, which has nothing to do with whether the zinc oxide was a product or a waste. Furthermore, Solvent indicated that some (unspecified) materials had value, *i.e.*, could be sold, while others may have to be disposed

---

**19.** This statement in the comments section is ambiguous at the least, since the evidence shows that Solvent purchased sal skimmings

from Bay State in May of 1978. Item 1054, Ex. I.

of. Whether the zinc oxide fell into the former or latter category is not indicated.

As the Bay State defendants point out, there are many problems with this document, including: the comment section stops in mid-sentence, it does not indicate whether the zinc oxide on hand originated with Bay State or any of its numerous other suppliers (some of whose flue dust was assessed as "unusable" because it was wet, etc.), it does not indicate how that zinc oxide was ultimately handled, and it makes no sense that Solvent would purchase Bay State's good quality flue dust only to dispose of it. Item 1090, p. 19.

Further, Exhibit K does not raise a genuine issue of material fact that Bay State sold its flue dust to Solvent during 1974 through 1977 to get rid of it, or that it was a waste, nor does it support Dr. Nauman's scientific opinion that the material was waste that had to be disposed of. In the face of Dr. Nauman's reliance on the exhibit, all that Solvent can say is that "Solvent *most likely* paid to dispose of zinc oxide by-products it considered valueless." Item 1113, p. 9 (emphasis added).

### F. Conclusion

The court finds that the statements set forth in Dr. Nauman's affidavits do not raise a genuine question of material fact to defeat the Bay State defendants' motion for summary judgment. The evidence Dr. Nauman cites does not support his conclusion that "the zinc materials sent to Solvent by Bay State Smelting were not a product and required processing by Solvent to become a useful product." Item 1054, ¶ 11. His affidavit is probative of no material fact. The court finds that his conclusions are not reliable and are not helpful in determining whether the useful product defense applies or whether Bay State arranged for disposal of the flue dust.

Without Dr. Nauman's affidavit, Solvent has submitted no evidence to oppose Bay State's summary judgment motion. Even if the court were to consider the exhibits attached to his affidavit, the evidence would still not be enough to raise a question of material fact that the useful product defense does not apply. There is no evidence showing that the sale of the zinc material was actually a sham for disposal. Bay State has provided sufficient evidence to show that its material was a useful product. Therefore, the court grants Bay State's motion for summary judgment and its motion to strike the affidavit of Dr. Nauman, and denies Solvent's cross-motion for summary judgment.

Because the court finds that there was no arrangement for disposal, Solvent's claim that Benjamin Sack is liable individually also fails.

### IV. Common Law Claims

In its fifth claim for relief, Solvent's complaint sets forth claims against the Zinc Waste Generators for implied equitable immunity and contribution under common law, in addition to a claim under CERCLA §§ 9607(a)(3) and 9613(f)(1). Item 1056, Ex. 4, p. 38. Bay State has argued that the equitable immunity and common law contribution claims fail as a matter of law. Item 1033, pp. 17–20. Solvent does not dispute that Bay State and Sack cannot be held liable under these common law theories. The court therefore grants summary judgment to Bay State on these claims as well.

### CONCLUSION

The Bay State defendants' motions to strike the affidavit of Dr. Nauman, Item 1095, and for summary judgment, Item 1032, are granted. Solvent's cross-motion for summary judgment, Item 1052, is denied. The Bay State defendants' motion

to strike the affidavit of Christopher Dow, Esq., Item 1093, is denied.

The court will conduct a telephone conference with counsel on August 19, 2002, at 2:30 p.m.

So ordered.